UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| TERRY D. TILMON | CIVIL ACTION NO. 1:13-CV-03127 |
| VERSUS | JUDGE DRELL |
| TIMOTHY KEITH, et al. | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

I.   Background

Before the Court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983, *in forma pauperis*, by pro se plaintiff Terry D. Tilmon ("Tilmon") on November 22, 2013 and amended on March 28, 2014 (Doc. 10). The named Defendants are Corrections Corporation of America ("CCA") (former operator of the Winn Correctional Center ("WCC") in Winnfield, Louisiana), the State of Louisiana,[1] Warden Timothy Keith ("Keith") (warden of WCC), and WCC corrections officers Kevin Jordan ("Jordan") (Housing Unit Manager at WCC) and Richard Cotton ("Cotton") (supervisor of the Prison Enterprise Garment factory at WCC). Tilmon contends that, while he was incarcerated in WCC, he was subjected to unconstitutional conditions of confinement: (1) he has been exposed to temperature extremes and rain due to broken windows in his housing unit; (2) he was denied the

---

[1] The State of Louisiana was never served. Tilmon never completed a summons for the State and no attempt was ever made to effect service. Accordingly, the complaint against the State of Louisiana should be dismissed without prejudice under Fed.R.Civ.P. 4(m).  See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191 (1994); Systems Signs Supplies v. U.S. Dept. of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988).

opportunity to practice an important part of his religion in 2012; (3) he was given a work assignment that was incompatible with his medical restrictions, causing him to reinjure his back; (4) he has been denied outside medical care for his back injury; and (5) he has been subjected to high levels of environmental tobacco smoke and synthetic marijuana smoke in his housing unit that have caused shortness of breath, headaches, sleeplessness, and disorientation, and have interfered with the practice of his religion.

Tilmon seeks monetary damages (including punitive damages) and injunctive relief (Doc. 10). Tilmon is still confined in WCC.

Defendants answered the complaints (Docs. 13, 18, 41). Tilmon and Defendants filed statements of issues for trial (Docs. 45, 46). Defendants next filed a motion for summary judgment (Doc. 57), which Tilmon opposes (Docs. 62, 63). Defendants' motion is now before the Court for disposition.

II. <u>Law and Analysis</u>

    A. <u>Standards governing the Motion for Summary Judgment.</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or

(4) issue any other appropriate order.[2]

"A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" See Hefren v. McDermott, Inc., 820 F.3d 767, 771 (5th Cir. 2016) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In deciding a motion for summary judgment, a court must construe all facts and draw all inferences in the light most favorable to the non-movant. See Dillon v. Rogers, 596 F.3d 260, 266 (5th Cir. 2010). However, a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. See Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).

B. The Eighth Amendment Generally

When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs, e.g., food, clothing, shelter, medical care, and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation that it has imposed on his freedom to act on his own behalf. See Hare v. City of Corinth, 74 F.3d 633, 639

---

[2] Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted unless the opposing party controverts those facts.

(5th Cir. 1996), and cases cited therein. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. See Hope v. Pelzer, 536 U.S. 730, 737-738 (2002) (citing Trop v. Dulles, 356 U.S. 86, 100 (1958)).

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Among unnecessary and wanton inflictions of pain are those that are without penological justification. See Hope, 536 U.S. at 737-738. No static test exists to measure whether conditions of confinement are cruel and unusual, because the Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society. See Talib v. Gilley, 138 F.3d 211, 213-14 (5th Cir. 1998).

In making this determination in the context of prison conditions, a court must ascertain whether the officials involved acted with deliberate indifference to the inmates's health or safety. We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. See Hope, 536 U.S. at 737-738. A prison official violates the Eighth Amendment only when: (1) the deprivation alleged is, objectively, sufficiently serious and the prison official's act or omission results in the denial of the minimum civilized measure of life's necessities; and (2) the prison official has a sufficiently culpable state of mind–deliberate indifference to a prisoner's constitutional rights. See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

C. **There are genuine issues of fact regarding whether Tilmon was subjected to unconstitutional conditions of confinement due to broken windows.**

Tilmon contends his dorm had broken windows that remained open throughout the year, exposing him to rain and temperature extremes. Tilmon contends Jordan sanctioned him when he complained about the windows (Doc. 10).

Defendants argue that a complaint about an allegedly broken window does not rise to the level of an Eighth Amendment violation. However, Tilmon has not complained about "a" broken window, but contends that eight of the seventeen windows in his housing unit were broken or inoperable (open) and were not repaired or covered during the winter. Tilmon claims he got wet when it rained at night, and that the inside temperature was cold because it was winter. Tilmon contends the cold causes him to have stiffness in his joints.[3]

Defendants contend the "one" inoperable window was taken care of by Jordon and closed by an orderly the day Tilmon complained about it. An affidavit from Jordan shows he was the housing unit manager at WCC in February 2013 and that Tilmon complained loudly to him about not being able to close the window in his cell (Doc. 57-5). Jordan states he looked at the window and instructed an orderly to close it (Doc. 57-5). Jordan was unaware the window would not close until Tilmon reported it to him, and no one except Tilmon complained about having a broken or inoperable window (Doc. 57-5).

---

[3] An affidavit by Daniel Marr, the WCC Health Services Administrator (Doc. 57-7), states there is nothing in Tilmon's medical records indicating that he has arthritis (Doc. 57-7).

5

An affidavit from the orderly who worked with Jordan, inmate Carnell Morris, shows that Jordan never asked Morris to repair or close a broken window (Doc. 62-1, pp. 22-23/69)). Tilmon contends that, when he complained to Jordon about his window, Jordon sanctioned him (Doc. 10).

Tilmon provided the response to his grievance about the windows, which states that Jordan notified maintenance about the problem with the windows, and maintenance addressed the problem (Doc. 62-1, p. 24/69). However, a memo from a WCC maintenance clerk shows that no work order was submitted to repair or replace windows in Tilmon's housing unit (Doc. 62-1, p. 25/69).

An affidavit by Patrick Dyas, an inmate in WCC, shows that he works in maintenance, that maintenance has not been able to repair the broken windows, and that the broken windows are either frozen open or frozen closed (Doc. 62-1, p. 2/69).

An affidavit by Wilbert Poole, an inmate incarcerated in WCC, shows the C-2 wing of the Birch housing unit has about eight windows that do not operate because the cranks do not work (Doc. 62-1, p. 4/69). Poole states the broken windows do not close properly and remain partially open the entire year, so it is cold inside in the winter, and rain enters through the open windows (Doc. 62-1, p. 4/69). Poole states the inmates use plastic trash bags to cover the windows to keep out the rain and cold, but housing unit manager Jordan removes the plastic from the windows (Doc. 62-1. P. 4/69). Poole testified those windows have been in the same condition for several years (Doc. 62-1, p. 5/69).

An affidavit by inmate William Dawson shows he was in the Birch housing unit with Tilmon on February 7, 2013 (Doc. 62-1, p. 6/69). Dawson stated there were about eight broken windows that made it very cold in the housing unit, and rain would enter through the windows so inmates would get wet when it rained at night (Doc. 62-1, p. 6/69). The inmates tried to cover the open windows with plastic but it was removed by Jordan. The windows were never repaired during the years Dawson was in Birch, C-2 (Doc. 62-1, p. 6/69).

An affidavit from inmate Shawn Arvie states that he is incarcerated at WCC (Doc. 62-1, p. 60/69). Arvie states the dormitories are extremely cold in the winter because the windows are inoperable and will not close, and the open windows have caused him to get wet when it rains (Doc. 62-1, p. 60/69).

An affidavit by inmate Anthony Butler shows he is incarcerated in WCC in the ASH unit (Doc. 62-1, p. 61/69). Butler states the window over his bed is stuck open 4 to 5 inches, which makes the dorm cold in the winter and hot in the summer (Doc. 62-1, p. 61/69).

Clearly, spending summer and winter in a dorm room that has eight of its seventeen windows open all the time, exposing the occupants to rain, heat, and cold, results in the denial of one of the minimum civilized measures of life's necessities–shelter. The length of time the windows were left "open" and unrepaired affects the Court's determinations of: (1) whether Defendants were deliberately indifferent to Tilmon's constitutional right to shelter from rain and temperature extremes; and (2)

whether the defendants were deliberately indifferent to Tilmon's unsheltered condition of confinement. See Beck v. Lynaugh, 842 F.2d 759, 761 (5th Cir. 1988).

Since there are genuine issues of material fact as to how many windows in Tilmon's dorm were open all the time, how long the windows were in that condition, and whether Defendants were deliberately indifferent to that condition, Defendants' motion for summary judgment should be denied on this issue.

### D. Tilmon has not stated a First Amendment claim for denial of his right to practice his religion.

Tilmon also contends that he is a practicing Muslim and that he was denied the ability to observe the Celebration of Sacrifice ("Eid ul Adha") at WCC on October 19, 2012.[4] Tilmon concedes that a settlement agreement in another case has afforded Muslim inmates the right to celebrate Eid ul Adha at WCC since 2012 (Doc. 10, Doc. 62-1, p. 7/170).

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." See Cutter v. Wilkinson, 544 U.S. 709, 712 (2005). The RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are dependent on the government's permission and accommodation for exercise of their religion. See Cutter, 544 U.S. at 721.

---

[4] Tilmon contends he was not permitted to celebrate Eid ul Adha from 2004 through 2012, but he seeks damages only for not being permitted to celebrate in 2012 (Doc. 10; Doc. 62-1, p. 8-9/69).

The issue of whether an inmate's right to the free exercise of his religion was violated must be analyzed under the "reasonable opportunity" test set forth by the Supreme Court in O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Restrictions on prisoners' right to practice their religious beliefs must be reasonably related to legitimate penological interests. Several factors are relevant in determining whether a prison regulation infringes on an inmate's constitutional rights: (1) whether there is a valid, rational correlation between the prison regulation and the legitimate governmental interest advanced; (2) whether there are alternative means of exercising the rights that remain available to the inmates; and (3) the impact of an accommodation in favor of the inmate on prison staff, other inmates, and the allocation of prison resources generally. Muhammad v. Lynaugh, 966 F.2d 901, 902 (5th Cir. 1992).

Defendants contend that, in 2012, WCC did not have a regulation or practice in place with regard to the observance of Eid ul Adha, but that it has since made accommodations for Muslim inmates to observe that day. Defendants argue that Tilmon's allegation that he missed the Celebration of Sacrifice feast one time does not rise to the level of a First Amendment violation.

The denial of a single meal does not constitute a substantial burden on the exercise of one's religion. See Pratt v. Corrections Corp. of America, 267 Fed.Appx. 482, 483 (8th Cir. 2008). Tilmon admits that Defendants have reached an agreement with the Muslim inmates for accommodation of the holy day of Eid ul Adha, and

9

contends he only missed the 2012 celebration.  Tilmon has not shown that Defendants have imposed a substantial burden on the free exercise of his religion.

Since there are no genuine issues of material fact that preclude a summary judgment, Defendants' motion for summary judgment should be granted on this issue.

### E. There are genuine issues of material fact regarding whether Defendants were deliberately indifferent to Tilmon's serious medical need for work compatible with his medical restrictions and duty status.

Tilmon further claims he was given a work assignment as a production worker in the garment factory that was incompatible with his medical restrictions after three back surgeries.

Defendants argue that Tilmon is complaining about his work classification, which is an administrative function of the prison.  However, Tilmon's complaint–that he was not given work that accommodated his medical restrictions–is a claim of deliberate indifference to serious medical needs.

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." See Estelle v. Gamble, 429 U.S. 97 (1976).  First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities.  Second, a prison official must have a sufficiently culpable state of mind–deliberate indifference to a prisoner's constitutional rights–to be subjected to a § 1983 liability to that prisoner.  See Farmer, 511 U.S. at 834.  The Supreme

Court defined "deliberate indifference" as "subjective recklessness," or, in other words, a conscious disregard of a substantial risk of serious harm. See Farmer, 511 U.S. at 839.

A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care. See Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. See Easter v. Powell, 467 F.3d 459, 463-464 (5th Cir. 2006) (citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)); see also Reese v. Skinner, 322 Fed.Appx. 381, 382-83 (5th Cir. 2009) (allegations that corrections officer forced inmate to do work that violated his medical restrictions, causing him to suffer injury and pain, stated a claim for deliberate indifference to serious medical needs).

Tilmon contends he was reassigned from file clerk to production worker (making towels) on January 27, 2013 by Defendant Cotton. Tilmon contends the job of production worker required a lot of bending, stooping, and standing. Tilmon's WCC duty status shows he has duty restrictions (since 2004) of no prolonged standing; no repeated bending, stooping, or squatting; no lifting over ten pounds; bottom bunk; and no walking more than a quarter mile (Doc. 62-1, p. 26/69). Tilmon contends he

gave his duty status restrictions to Cotton on his first day of work in the garment factory (Doc. 62).

Tilmon contends that, on January 29, 2013, he hurt his back at work while bending to retrieve towels, resulting in severe lower back pain, the inability to place weight on his right leg, and the inability to sit more than five minutes. Tilmon submitted an affidavit from inmate Isaac Handy, Sr., that states working in the "towel section" of the garment factory requires prolonged standing and a lot of bending (Doc. 62-1, pp. 30-31/69).

Defendants argue that Defendant Cotton did not receive any information concerning duty restrictions from the medical department, and Tilmon did not tell Cotton that he had duty restrictions that would prevent him from working in the garment factory.

Cotton states in his affidavit that he worked in the garment factory at WCC from 2010 through 2015, and his duties included assigning inmates to job assignments within the garment factory (Doc. 57-6). Cotton states he never received information about duty restrictions from the medical department when an inmate was assigned to the garment factory (Doc. 57-6). If an inmate was assigned to work in the garment factory, it was assumed he was able to work in any of the jobs there (Doc. 57-6). Cotton states he was unaware the Tilmon had duty restrictions (Doc. 57-6). Cotton also states in his affidavit that towels are occasionally made in the garment factory and, when inmates make towels, they sit in a chair and might bend over to place a folded towel in a box (Doc. 57-6).

12

There are genuine issues of material fact as to whether Cotton was aware of Tilmon's duty status restrictions, and whether Cotton assigned Tilmon to do work that was incompatible with his duty status restrictions and that resulted in a back injury. Therefore, Defendants' motion for summary judgment should be denied on this issue.

F. <u>Tilmon has not shown he was denied adequate medical care for his back by any of the named Defendants.</u>

Tilmon contends he was denied appropriate medical care for his back after he injured it in the garment factory on January 29, 2013 (Doc. 10). Tilmon contends he was not seen until January 31, 2013, when Nurse Wyatt suggested Tilmon take off work for three days. Tilmon was seen again in medical on February 2, 2013 and referred to Doctor Chlorette, who prescribed Motrin 600 mg twice a day for five days (Doc. 10). On September 3, 2013, Dr. Chlorette prescribed Flexeril, Naprosyn, and an analgesic balm, and advised Tilmon to take over-the-counter pain tablets (Doc. 10). Tilmon contends that Dr. Chlorette also said he would refer Tilmon to an outside doctor for further evaluation, but he has not been sent to an outside doctor.

Although the Eighth Amendment does not mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive *adequate* medical care. See <u>Easter</u>, 467 F.3d at 463 (citing <u>Farmer</u>, 511 U.S. at 832). The fact that the medical care given is not the best that money can buy does not amount to deliberate indifference. See <u>Mayweather v. Foti</u>, 958 F.2d 91 (5th Cir. 1992); <u>Ruiz v. Estelle</u>, 679 F.2d 1115, 1149

(5th Cir.1982), amended in part and vacated in part on other grounds, 688 F.2d 266, 267 (5th Cir.1982).

Tilmon has not named any defendants who have allegedly denied him medical care for his back. Tilmon admits he received medical care at WCC, and complains only that he has not been sent to an outside provider as suggested by Dr. Chlorette. Although Tilmon contends Warden Keith was put on notice by this lawsuit that Tilmon has not been referred for outside medical care, that allegation is not sufficient to show Warden Keith denied Tilmon medical care before he filed the lawsuit. Moreover, Tilmon has not shown that the medical care he is receiving at WCC is inadequate under applicable standards.

Therefore, Defendants' motion for summary judgment should be granted on the issue of denial of medical care for Tilmon's back injury.

G. <u>There are genuine issues of material fact regarding whether Tilmon was subjected to second-hand tobacco smoke and synthetic marijuana smoke in WCC.</u>

Finally, Tilmon contends that, because of understaffing at WCC, he has been subjected to high levels of environmental tobacco smoke and synthetic marijuana smoke inside WCC (Doc. 10; Doc. 62-1, p. 9/69). Tilmon alleges that, although WCC has occasionally attempted to designate non-smoking housing units, inmates have been able to smoke in the non-smoking units due to understaffing. Tilmon alleges he has had shortness of breath, headaches, sleeplessness, and disorientation due to inhaling second-hand tobacco smoke and synthetic marijuana, and that it has interfered with his ability to pray (Doc. 10 Doc. 62-1, p. 9/69). Tilmon states he has

14

felt intoxicated from the marijuana smoke, and he cannot practice his religion when he is intoxicated (Doc. 10 Doc. 62-1, pp. 9, 63-66/69).

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that the Eighth Amendment protects prisoners from an official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health. Id. at 33-35. If the claim is based on exposure to environmental tobacco smoke, the prisoner "must show that he himself is being exposed to unreasonably high levels of environmental tobacco smoke," "that the risk of which he complains is not one that today's society chooses to tolerate," and that prison officials showed deliberate indifference to the risk. Id. at 35-36; see also Todd v. Hawk, 263 F.3d 162 (5th Cir. 2001).

Tilmon contends Warden Keith was aware inmates were smoking inside WCC because it has been alleged in several prior lawsuits and grievances, and because it is obvious (Doc. 62). Tilmon contends Keith's failure to act until 2016 to enforce the smoking policy (by banning smoking at WCC altogether) constitutes deliberate indifference to a serious risk to Tilmon's health.

An affidavit by Brenda Smiley, the Chief of Unit Management at WCC from 2011 to 2015, shows that indoor smoking was banned at WCC on August 15, 2009 because of the Louisiana Smoke-Free Air Act, but that smoking was permitted outdoors (Doc. 62-1, p. 53/69). Smiley stated that security checks of the tiers were performed on irregular intervals, and that inmates caught smoking in the tiers were written up for a disciplinary violation (Doc. 62-1, p. 54/69). Smiley stated that

corrections officers did not look the other way and allow inmates to smoke indoors (Doc. 62-1, p. 54/69). Tilmon shows that Smiley submitted the same affidavit, as to environmental tobacco smoke, in a previous lawsuit (Rickey Gipson v. Tim Keith, No. 1:14-CV-2278 (W.D.La.)) (Doc. 62-1, p. 56/69)).

An affidavit by Daniel Marr, the WCC Health Services Administrator (Doc. 57-7), states that Tilmon did not complain to the medical department about exposure to second-hand tobacco smoke or synthetic marijuana smoke (Doc. 57-7).

An affidavit by Patrick Dyas shows he is an inmate with cystic fibrosis who is incarcerated in WCC (Doc. 62-1, p. 1/69). Dyas states that inmates smoke in all of the dorms, and that he is exposed to second hand tobacco and synthetic marijuana in WCC (Doc. 62-1, p. 1/69). Dyas also states that, if corrections officers see an inmate smoking, they may tell the inmate to "put it out," or they may not say or do anything (Doc. 62-1, p. 1/69). Dyas said the inmates are unsupervised, so they smoke all day and night (Doc. 62-1, p. 2/69).

Tilmon submitted an affidavit by inmate Ashley Smith. Smith states he is incarcerated in WCC; he is a non-smoker; and he has been subjected to "very strong" levels of tobacco smoke (Doc. 62-1, p. 35/69). Smith further states that smoking policies are not enforced at WCC because there are not enough officers to stop inmates from smoking in the housing units (Doc. 62-1, pp. 35-3669).

Tilmon also submitted a January 6, 2016 memo from Warden Deville that states, as of January 15, 2016, WCC is a "smoke free" facility (Doc. 62-1, p. 51/69). Although smoking is banned by law inside Louisiana prisons, WCC has since become

16

"smoke free," which means smoking is no longer permitted anywhere on the prison grounds, even outdoors. LaSalle Corrections (the current operator of WCC) also offers a smoking cessation program for inmates (Doc. 62-1, p. 52/69).

An affidavit by Shawn Arvie, an inmate at WCC, shows that Arvie smokes cigarettes (Doc. 62-1, p. 60/69). Arvie states he was assigned a bed next to the Tilmon, and Tilmon would occasionally complain to Arvie about the smoke (Doc. 62-1, p. 60/69). Arvie states they were not given "smoke breaks" at night (Doc. 62-1, p. 60/69). Arvie further states there were approximately 35 smokers in their dormitory and about nine non-smokers, and inmates smoked in the dorms all day and night (Doc. 62-1, p. 60/69).

An affidavit by inmate Anthony Butler shows he is incarcerated in WCC in the ASH unit. Butler states the window over his bed is stuck open 4 to 5 inches, which does not allow adequate ventilation for the tobacco smoke to escape (Doc. 62-1, p. 61/69).

Tilmon appears to be contending that CCA's policy or custom of understaffing WCC caused him to be subjected to second-hand smoke. To support his contention that WCC was understaffed, Tilmon offers the affidavits of other inmates and an article that refers to the undercover investigative report by Shane Bauer, who became a prison guard at WCC in order to investigate and report on conditions there.

According to the article, Bauer reported that WCC was "horrendously short staff[ed]." Bauer's article was reported in "Mother Jones."[5]

There are genuine issues of material fact as to: (1) whether Tilmon was subjected to second-hand tobacco smoke and synthetic marijuana inside WCC; and (2) whether CCA had a policy or custom of understaffing WCC that caused Tilmon to be exposed to second-hand smoke inside WCC. Therefore, Defendants' motion for summary judgment should be denied on this issue.

### III. Conclusion

For the foregoing reasons, IT IS RECOMMENDED that Tilmon's complaint against the State of Louisiana be DISMISSED WITHOUT PREJUDICE pursuant to Fed.R.Civ.P. 4(m).

IT IS RECOMMENDED that Defendants' motion for summary judgment (Doc. 57) be GRANTED on the issues of religious freedom and denial of outside medical care for Tilmon's back injury.

IT IS FURTHER RECOMMENDED that Defendants' motion for summary judgment (Doc. 57) be DENIED on the issues of: (1) whether Tilmon has been exposed to temperature extremes and rain due to broken windows in his housing unit; (2) whether Tilmon had a work assignment that was incompatible with his medical restrictions and caused him to reinjure his back; and (3) whether Tilmon has been

---

[5] Bauer's article, "My Four Months as a Private Prison Guard, is available at: http://www.motherjones.com/politics/2016/06/cca-private-prisons-corrections-corporation-inmates-investigation-bauer.

18

subjected to high levels of environmental tobacco smoke and synthetic marijuana smoke in his housing unit.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 14th day of September, 2016.

_____
Joseph H.L. Perez-Montes
United States Magistrate Judge